IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

JOEL E. HIRSH                    : CIVIL ACTION
                                 :
vs.                              :
                                 : NO. 09-CV-3120
BOEING HEALTH AND WELFARE        :
BENEFIT PLAN, a/k/a THE          :
BOEING TRADITIONAL MEDICAL       :
PLAN, and BOEING EMPLOYEE        :
BENEFITS PLAN COMMITTEE          :

## MEMORANDUM AND ORDER

**JOYNER, J.**                              **June 14, 2010**

    This action is now pending before this Court for
resolution of the parties' cross-motions for summary
judgment. For the reasons outlined in the paragraphs which
follow, the motions shall be granted in part and denied in
part.

### Background Facts

    Plaintiff Joel Hirsh is an employee of the Boeing
Company and, as such, he and his family have health care
coverage under the Boeing Health and Welfare Plan,
otherwise known as the Boeing Traditional Medical Plan
(hereinafter "Plan"). Since he was a small child, Mr.
Hirsh's son A.H. has required psychiatric and/or mental
health treatment.[1] In 2006 when he was 15 years old, A.H.

---

[1] More recently, A.H. has been diagnosed as suffering from, inter
alia, major depressive disorder with psychotic features, anxiety
disorder with obsessive thoughts and polysubstance dependence, as

began receiving that treatment on an inpatient basis, at a number of different facilities.[2]

On or about March 7, 2007, A.H. entered in-patient treatment at Innercept Academy, located in Coer D'Alene, Idaho. With the exception of several brief visits home to Wynnewood,Pennsylvania, A.H. remained at Innercept until April 19, 2008, when his parents transferred him to the King George School ("KGS"), a therapeutic boarding school in Vermont. A.H. apparently received in-patient treatment at the King George School until sometime in April 2009.

---

well as a variety of learning disorders. As of November, 2007, he also demonstrated a "[p]ersistent danger of self harm/suicide, delusional impairment in reality testing, compulsive need to self medicate with illegal substances, inability to regulate personal hygiene and the danger of self injurious behavior or elopement." (AR0060-AR0062).

[2] Indeed, the Administrative Record reflects that between June 22, 2006 and August 8, 2006, A.H. was placed in the wilderness program at Three Rivers Montana in Belgrade, Montana. On or about August 9, 2006, A.H. was transferred to Logan River Academy in Logan, Utah where he remained through November 8, 2006. The plaintiff and his wife paid slightly more than $20,000 to Three Rivers Montana for A.H.'s participation in the wilderness program, none of which was reimbursed by the plan. Although A.H. was eventually asked to leave the Logan River Academy, Mr. Hirsh's insurance did pay for his treatment and stay there. Immediately after his removal from Logan River, A.H. was admitted to the Northern Idaho Behavior Health ("NIBH") facility in Coeur d'Alene, Idaho. NIBH charged about $28,000 per month but it was a contracted "in-network" provider under the plan and thus most of the NIBH bill was paid by the plan. A.H. was transferred from NIBH to Innercept Academy on March 7, 2007, primarily because two of his treating therapists from NIBH were on staff there and because it was academically accredited which would enable A.H. to complete 10th grade there. (AR0647-AR0682). As noted, aside from a few visits home to Pennsylvania, A.H. remained at Innercept until April, 2008 when he transferred to the King George School in Vermont. He stayed at King George for approximately one year-- through April, 2009.

Despite Plaintiff's repeated submissions of bills and doctor's reports, and appeals for payment of A.H.'s in-patient expenses from Innercept and KGS, the defendants have refused coverage and/or reimbursement for any of A.H.'s treatment at KGS and have refused to pay anything more than $13,753 for the care which he received at Innercept.[3]

On July 13, 2009, Plaintiff commenced this lawsuit pursuant to Section 502 of the Employee Retirement Income Security Act, 29 U.S.C. §1132 ("ERISA") seeking to recover the full amount of benefits due under the Plan, together with counsel fees, interest, and costs of suit. In reliance on the administrative record, both parties now move for the entry of judgment in their favor pursuant to Fed. R. Civ. P. 56.

## Standards Governing Summary Judgment Motions

Fed. R. Civ. P. 56(c)(2) dictates the general standard for determining motions for summary judgment:

> "The judgment sought should be rendered if the
> pleadings,the discovery and disclosure materials on
> file, and any affidavits show that there is no genuine

---

[3] According to the complaint in this matter, Innercept billed Mr. Hirsh approximately $38,000 for A.H.'s treatment between March 7, and June 30, 2007, and $85,000 for the care he received between July 10, 2007 and April 19, 2008. (Pl's Complaint, ¶s 11-12, 17). The complaint further avers that Mr. Hirsh paid the King George School some $91,400 for the services which it provided to A.H. in the one-year period between April 2008 and April 2009. (Complaint, ¶24).

> issue as to any material fact and that the movant is
> entitled to judgment as a matter of law."

An issue is genuine only if there is a sufficient evidentiary basis on which a reasonable jury could find for the non-moving party, and a factual dispute is material only if it might affect the outcome of the suit under governing law. Kaucher v. County of Bucks, 456 F.3d 418, 423 (3d Cir. 2006), citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). The summary judgment standard requires us to resolve all ambiguities and to view all facts and draw all factual inferences in favor of the non-moving party. Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986); Gardner v. Unum Life Insurance Co. of America, 354 Fed. Appx. 642, 648, 2009 U.S. App. LEXIS 26363 at *14 (3d Cir. Dec. 4, 2009); Lawrence v. City of Philadelphia, 527 F. 3d 299, 310 (3d Cir. 2008). Under Fed. R. Civ. P. 56(a) and (b), a summary judgment motion may be filed by either the party claiming relief or the defending party and the same principles apply when there are cross-motions for summary judgment. See, Lawrence, supra.

## Discussion

Congress enacted ERISA to "protect ... the interests of participants in employee benefit plans and their beneficiaries" by setting out substantive regulatory requirements for employee benefit plans[4] and to "provide for appropriate remedies, sanctions and ready access to the Federal courts." Aetna Health, Inc. v. Davila, 542 U.S. 200, 208, 124 S. Ct. 2488, 2495, 159 L. Ed. 2d 312 (2004) quoting 29 U.S.C. §1001. The purpose of ERISA is to provide a uniform regulatory regime over employee benefit plans. Id.

ERISA "permits a person denied benefits under an employee benefit plan to challenge that denial in federal court." Barinova v. ING, No. 08-4189, 2010 U.S. App. LEXIS 2368 at *7 (3d Cir. Feb. 4, 2010), quoting Metropolitan Life Insurance Co. v. Glenn, 554 U.S. 105, 128 S. Ct. 2343,

---

[4] Under 29 U.S.C. §1002(1),

[t]he terms 'employee welfare benefit plan' and 'welfare plan' mean any plan, fund, or program which was heretofore or is hereafter established or maintained by an employer or by an employee organization, or by both, to the extent that such plan, fund, or program was established or is maintained for the purpose of providing for its participants or their beneficiaries, through the purchase of insurance or otherwise, (A) medical, surgical or hospital care or benefits or benefits in the event of sickness, accident, disability, death or unemployment, or vacation benefits, apprenticeship or other training programs or day care centers, scholarship funds, or prepaid legal services, or (B) any benefit described in section 186(c) of this title (other than pensions on retirement or death, and insurance to provide such pensions).

2346, 171 L. Ed. 2d 299, 305 (2008). To this end, Section
502(a)(1)(B) provides the following, in relevant part:

**(a) Persons empowered to bring a civil action**

A civil action may be brought –

>     **(1)** by a participant or beneficiary –

> ....

> > **(B)** to recover benefits due to him under the
> > terms of his plan, to enforce his rights
> > under the terms of the plan, or to clarify
> > his rights to future benefits under the
> > terms of the plan;

Such claims may be brought against an ERISA plan

itself or against the persons who are shown to have control

over the plan in their fiduciary capacity. Rieser v.

Standard Life Insurance Company, Civ. A. No. 03-5040, 2004

U.S. Dist. LEXIS 11556 at *16 (E.D.Pa. June 24, 2004),

citing Curcio v. Hancock Mutual Life Insurance Co., 33 F.3d

226, 233 (3d Cir. 1994). A plaintiff seeking to recover

under Section 502(a)(1)(B) must demonstrate that the

benefits are "actually due," that is, he or she must have a

right to benefits that is legally enforceable against the

plan. Hooven v. Exxon Mobil Corp., 465 F.3d 566, 574 (3d

Cir. 2006). However, the ERISA statute itself fails to

state the appropriate standard of review to be applied in

actions challenging benefits denials under Section

502(a)(1) and it has therefore been left to the courts to

carve out the appropriate standards. In so doing, the
Supreme Court looked to trust law for guidance, recognizing
that the proper standard of review of a trustee's decision
depends on the language of the instrument creating the
trust. Conkright v. Frommert, U.S. , 130 S. Ct. 1640, 176
L. Ed. 2d 469, 475 (2010). Under trust law, if the trust
documents give the trustee power to construe disputed or
doubtful terms, the trustee's interpretation will not be
disturbed if reasonable. Id.

Based on these considerations, the Supreme Court
decreed that "a denial of benefits challenged under
§1132(a)(1)(B) is to be reviewed under a de novo standard
unless the benefit plan gives the administrator or
fiduciary discretionary authority to determine eligibility
for benefits or to construe the terms of the plan." Id.,
quoting Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101,
115, 109 S. Ct. 948, 103 L. Ed. 2d 80 (1989). When the
administrator has this authority, courts apply an arbitrary
and capricious standard of review. Doroshow v. Hartford
Life and Accident Insurance Co., 574 F.3d 230, 233 (3d Cir.
2009); Abnathya v. Hoffman-LaRoche, Inc., 2 F.3d 40, 45 (3d
Cir. 1993).[5] But if a benefit plan gives discretion to an

---

[5] At least in the ERISA context, the "arbitrary and capricious"

administrator or fiduciary who is operating under a
conflict of interest, that conflict must be weighed as a
factor in determining whether there is an abuse of
discretion. Firestone, 489 U.S. at 115, 109 S. Ct. at 957.
Such a conflict of interest is created where the entity
that administers the plan, such as an employer or an
insurance company, both determines whether an employee is
eligible for benefits and pays benefits out of its own
pocket. Metropolitan Life Ins. v. Glenn, 128 S. Ct. at
2346.[6]

---

standard of review and the "abuse of discretion" standard are
practically identical. Estate of Schwing v. The Lilly Health
Plan, 562 F.3d 522, 526, n.2 (3d Cir. 2009). Under these
standards, a reviewing court may overturn an administrator's
decision to deny benefits "if it is without reason, unsupported
by substantial evidence or erroneous as a matter of law." Orr v.
Metro Life Insurance Co., Civ. A. No. 1:CV-04-557, 2007 U.S.
Dist. LEXIS 67855 at *31-*32 (M.D. Pa. Sept. 13, 2007), quoting
Abnathya, supra.

[6] Indeed, in the Firestone and Glenn cases, the Supreme Court
outlined the following four relevant principles for reviewing
benefits determinations made by fiduciaries and/or plan
administrators:

(1) In "determining the appropriate standard of review," a court
should be "guided by principles of trust law;" in doing so, it
should analogize a plan administrator to the trustee of a common-
law trust; and it should consider a benefit determination to be a
fiduciary act (i.e., an act in which the administrator owes a
special duty of loyalty to the plan beneficiaries).

(2) Principles of trust law require courts to review a denial of
plan benefits "under a de novo standard" unless the plan provides
to the contrary.

(3) Where the plan provides to the contrary by granting "the
administrator" or fiduciary discretionary authority to determine

ERISA's framework also ensures that employee benefit plans be governed by written documents and summary plan descriptions, which are the statutorily established means of informing participants and beneficiaries of the terms of their plan and its benefits. In re Lucent Death Benefits ERISA Litigation, 541 F.3d 250, 254 (3d Cir. 2008), quoting In re Unisys Corp. Retiree Medical Benefit ERISA Litigation, 58 F.3d 896, 902 (3d Cir. 1995). It is therefore incumbent upon the courts to look to the plan documents to interpret plan obligations. In re Lucent, 541 F.3d at 254. The written terms of a plan control and employers may not modify or supercede them orally. Gardner, supra; In re Lucent, 541 F. 3d at 255. When a plan is clear and unambiguous, a court must determine its meaning as a matter of law without looking to extrinsic evidence. In re Lucent, id., citing International Union v. Skinner Engine Co., 188 F.3d 130, 138, 145 (3d Cir. 1999). Likewise in considering a claim, a court may not substitute its own judgment for that of the plan administrator. Stratton v.

---

eligibility for benefits, trust principles make a deferential standard of review appropriate.

(4) If a "benefit plan gives discretion to an administrator or fiduciary who is operating under a conflict of interest that conflict must be weighed as a factor in determining whether there is an abuse of discretion. Metropolitan Life Insurance Co. v. Glenn, 128 S. Ct. at 2347-2348 quoting, inter alia, Aetna Health v. Davila, 542 U.S. at 218 and Firestone, 489 U.S. at 111-115.

E.I. DuPont de Nemours & Co., 363 F.3d 58, 69 (3d Cir.
2004). That is, the court's review should be based on the
record available to the plan administrator and should not
represent the court's independent judgment of the
claimant's disability. Orr v. Metro Life Ins. Co., 2007
U.S. Dist. LEXIS at *32 citing Kosiba v. Merck & Co., 384
F.3d 58, 69 (3d Cir. 2004). See also, Mitchell v. Eastman
Kodak Co., 113 F.3d 433, 440 (3d Cir. 1997); Magera v.
Lincoln National Life Insurance Co., No. 3:08-CV-565, 2009
U.S. Dist. LEXIS 7871 at *4 (M.D. Pa. Feb. 4, 2009). Where
a court is applying "the arbitrary and capricious standard
of review, the 'whole' record consists of that evidence
that was before the administrator when he made the decision
being reviewed." Magera, id., quoting Mitchell v. Eastman
Kodak, 113 F.3d at 440.

   As is clearly stated in the plan documents in this
case, the Plan Sponsor of the plaintiff's medical benefits
plan is the Boeing Company and the Plan Administrator is
the Employee Benefits Plans Committee ("EBPC"). The EBPC
may be reached and contacted at the same address as the
Boeing Company. (AR0434, AR0529, AR0969). The plan
documents further state:

        As Plan Administrator, the EBPC has authority over
        administration of the Plan and has all powers
        necessary to enable it to carry out its duties as Plan

Administrator, such as determining questions of
eligibility and benefit entitlement. The Plan
Administrator has authority to make these
determinations in its sole discretion. The Plan
Administrator's decision upon all such matters is
final and binding.

The Plan Administrator also has been delegated
authority by the Board of Directors to amend the Plan.
The Board of Directors has authority to terminate the
Plan. The Plan Administrator may establish rules and
procedures to be followed by participants and
beneficiaries in filing applications for benefits and
in other matters required to administer the Plan. In
addition, the Plan Administrator may

- Prescribe forms for filing benefit claims and for
  annual and other enrollment materials.
- Receive all applications for benefits and make
  all determinations of fact necessary to establish
  the right of the applicant to benefits under the
  provisions of the Plan, including the amount of
  such benefits.
- Appoint accountants, attorneys, actuaries,
  consultants, and other persons (who may be
  employees of the Company) to advise the Plan
  Administrator; also the Plan Administrator may
  rely upon the opinions of counsel and upon
  reports furnished by others that it selects.
- Delegate these and other administrative duties
  and responsibilities to persons or entities of
  its choice (including delegation to employees of
  the Company).

  . . . . .

(AR0529).[7]

---

[7] The foregoing language is contained in the 2000 Edition of the
Plan, and was apparently undisturbed by the various amendments
made thereto between 2000 and 2007. The language in the 2008
version of the Plan is similar and likewise vests discretion to
determine benefits eligibility in the Plan Administrator:

Notwithstanding any other provision in the Plan, and to the
full extent permitted under ERISA and the Internal Revenue
Code, the Plan Administrator has the exclusive right,

Included in the plan is a Mental Health and Substance

Abuse Program which "provides benefits for treatment of

mental illness (including eating disorders, such as

---

power, and authority, in its sole and absolute discretion, to

- Administer, apply, construe, and interpret the Plan and all related Plan documents.
- Decide all matters and questions arising in connection with entitlement to benefits and the nature, type, form, amount, and duration of benefits.
- Amend the Plan.
- Establish rules and procedures to be followed by participants and beneficiaries in filing applications for benefits and in other matters required to administer the Plan.
- Prescribe forms for filing benefit claims and for annual and other enrollment materials.
- Receive all applications for benefits and make all determinations of fact necessary to establish the right of the applicant to benefits under the provisions of the Plan, including the amount of such benefits.
- Appoint accountants, attorneys, actuaries, consultants, and other persons (who may be employees of the Company) for advice, counsel and reports to make determinations of benefits or eligibility.
- Delegate its administrative duties and responsibilities to persons or entities of its choice such as the Boeing Service Center, the service representatives, and employees of the Company.

All decisions that the Plan Administrator (or any duly authorized designees) makes with respect to any matter arising under the Plan and any other Plan documents are final and binding. If any part of this Plan is held to be invalid, the remaining provisions will continue in force.

(AR0434-AR0435).

Finally, the Boeing Company's Master Welfare Plan effective as of January 1, 2007 likewise contains similar, but not identical language as to the Plan Administrator. (See, e.g., AR0969-AR0974). Because the parties have not specified precisely which version of the Plan was in effect at the time(s) at issue in this action, we have variously referred to and/or quoted from each of them.

12

anorexia nervosa or bulimia) and substance abuse (including abuse of or addiction to alcohol, recreational, or prescription drugs). The program is administered by Value Options." Value Options, which appears to be a health care management/utilization review company is alternatively described as the "service representative" which "administers the program, maintains the provider network, and operates the Boeing Helpline." (AR0336-AR0337, AR0397, AR0501).[8]

By way of a separate contract, the Boeing Company engaged the services of Regence Blue Shield to provide claims processing, payment and administration services relative to the non-mental health components of the traditional medical plan. (AR0449-AR0452). Under that contract, Regence and Boeing further agreed that Regence Blue Shield "shall finally determine in its discretion whether to pay benefits and cover services, in accordance with the procedures in the Plan." (AR0457).[9] Furthermore,

---

[8] Again, while the wording used in the 2000 and 2008 versions of the Mental Health and Substance Abuse Program portions of the plan is not identical, the meaning is for all intents and purposes, the same. For this reason, we excerpt portions of the two versions of the plan interchangeably.

[9] It is also evident from our review of the Administrative Record that Regence Blue shield was similarly charged with reviewing benefits determinations under the Mental Health and Substance Abuse Program. (See, e.g., AR0685-AR0690).

for services to be eligible for reimbursement under the
Mental Health Program portion of the plan, the treatment
must be determined to be "medically necessary,[10]" and
received from any provider contracted with the Boeing
Helpline, a licensed psychiatric doctor (M.D.), a licensed
clinical psychologist, licensed psychiatric nurse (R.N.) or
psychiatric professional at the master's level or above, or
from a hospital or treatment facility. If the services are
provided by a network provider (i.e. one referred by the
Boeing Helpline), they will be reimbursed at the rate of
100% after the annual deductible for covered inpatient,
partial hospital, or intensive outpatient services;

---

[10] Medically necessary means that the treatment, services, or
supply meets the following criteria in accordance with the plan
and as determined by the service representative. The treatment,
service or supply is:

- Required to diagnose or treat the patient's illness,
  injury, or condition; and the condition cannot be
  diagnosed or treated without it.
- Consistent with the symptom or diagnosis and the
  treatment of the condition.
- The most appropriate service or supply that is
  essential to the patient's needs.
- Appropriate as good medical practice.
- Professionally and broadly accepted as the usual,
  customary, and effective means of diagnosing or
  treating the illness, injury, or condition.
- Unable to be provided safely to the patient as an
  outpatient (for an inpatient service or supply).

A treatment, service, or supply may be medically necessary in
part only. The fact that a physician furnishes, prescribes,
recommends, or approves a treatment, service, or supply does not,
by itself, make it medically necessary.

(AR0382).

residential treatment may be covered under the plan when it
is authorized in place of inpatient care. For nonnetwork
providers, the reimbursement rate is only 50% of usual and
customary charges after the annual deductible for the
covered services of a non-referred provider if the care is
certified as covered by the Boeing Helpline. Where the
"mental health treatment is related to, accompanies or
results from substance abuse, the program will cover only
substance abuse treatment." (AR0397-AR0398; AR0501-AR0502).

As is apparent from the preceding language, the plan
administrator has discretionary authority to make
determinations as to eligibility for and entitlement to
benefits. Since the EBPC appears to be part of the Boeing
Company itself, we find that the plan administrator
likewise appears to be operating under a conflict of
interest. Thus, while we apply the arbitrary and
capricious/abuse of discretion standard of review to the
claims in this case, we shall consider the conflict of
interest in that application.

The Administrative Record in this matter is voluminous
and reflective of the ongoing (and often-unnecessary in
this Court's opinion) struggle which Plaintiff was forced
to endure with Value Options, the service representative
for the Mental Health portion of the defendant plan. To be

sure, the record reveals that although it at first refused
certification and denied coverage for A.H.'s initial
admission to Innercept, after several months and multiple
appeals to Regence Blue Shield, Value Options ("VO")
eventually agreed that the treatment which A.H. received at
Innercept between March 7 and July 10, 2007 was medically
necessary and approved coverage.[11] However, notwithstanding
its eventual certification of care, VO determined and
subsequently Regence Blue Shield upheld the decision that
the "usual and customary charge" for the services provided
to A.H. by Innercept for that period of time was $13,753
per admission. In contrast, Innercept's charges for that
time frame equal approximately $40,000. (AR0691).
Specifically, the letters from Regence Blue Shield
upholding the denial of payments in excess of $13,753 for

---

[11] It is interesting that Value Options' explanations for the
denial of benefits for A.H.'s admission to Innercept changed no
fewer than 7 times. (See, e.g., AR0122-AR0148). Examples of the
bases for VO's denials include that Innercept "did not meet
[VO's] standards for Residential Treatment Facilities as there is
not 24 hour a day licensed staff coverage;" "because Treatment
planning is not individualized and/or appropriate to the
individual's condition, and/or does not include specific goals
and objectives within a reasonable timeframe," and that VO's
review "does not indicate the presence of self-harming behaviors
or current aggressive threatening behaviors that would meet
criteria for Residential Treatment Setting. An appropriate level
of care to the needs of the patient is Outpatient Services,"
which was later amended to "Partial Hospitalization with
Intensive/Structured setting," and still later to "Partial
Hospitalization." (See also, AR 0073-AR095, AR0329-AR0357,
AR0647-AR0682)).

A.H.'s admission to Innercept explain that this amount was

calculated

> "based upon the charge that is most frequently made by
> providers with similar qualifications for comparable
> services or supplies within the same geographic area.
> When determining the profile amounts within a specific
> area, the Plan utilizes the performing provider's zip
> code. Services rendered from March 7, 2007 through
> June 30, 2007 processed to Coeur d'Alene, ID, zip code
> 83816. In addition, inpatient hospital charges from
> out of state providers are reimbursed at a flat rate
> per admission and are not based on the length of stay.
> The usual and customary amount for A.H.ander's
> inpatient hospital admission for these behavior health
> services, provided within zip code 83816 is $13,753
> per admission..." (AR0685–AR0688).

Defendants rely upon the following plan language to

justify the decision to limit the reimbursement amount for

A.H.'s Innercept admission to the amount referenced above:

> **How the Plan Determines the Covered Charge**
>
> This plan pays benefits based on the **covered charges**.
> A covered charge is the provider's charge for a
> **covered service** or supply, up to the service
> representative's maximum allowance. The amount of the
> covered charge depends on whether you see a network or
> a **nonnetwork provider**.
>
> - For a **network provider**, the **service
>   representative** determines the amount of the
>   covered charge for a particular service or supply
>   under any applicable agreement between the
>   service representative and the **provider**.
>
> - For nonnetwork provider, the covered charge is
>   based on the **usual and customary** charge for the
>   covered service or supply. This plan does not
>   cover or otherwise recognize any portion of a
>   provider's charge that exceeds the usual and
>   customary charge; you are responsible for these
>   charges.

**Usual and Customary Charge.** The usual and customary charge is the maximum charge for a covered service or supply the service representative will consider for reimbursement from a nonnetwork provider. The service representative may refer to this as the "maximum reimbursable charge," "maximum allowable charge," "reasonable and customary charge," "allowed amount," or a similar term.

The usual and customary charge is the least of

• The provider's actual charge for the service or supply,
• The provider's normal charge for a similar service or supply, or
• A predetermined percentile (negotiated between each carrier and plan sponsor) of charges made by providers of a comparable service or supply in the geographic area where it is received.

To determine if a charge exceeds the usual and customary charge for medical services or supplies in situations involving unusual or complicated services or supplies, the nature and severity of the injury or sickness may be considered.

The service representative uses a database of provider charges to determine the usual and customary charge in an area. Information about the database and percentile used to determine the usual and customary charge can be obtained by contacting the service representative.

If you use a nonnetwork provider, you pay any charges above the usual and customary amount.

**Benefit Maximums**

This plan limits the amount of money that it will pay for certain services and for any one person covered by this plan.

• A benefit maximum limits the amount the plan will pay for a specific **covered service** for a specified period or visit, depending on the service. Once a **participant** reaches a benefit maximum, this plan will not cover that specific

```
                    service or supply for the rest of the specified
                    period.
                    ...
```

(AR0381).

Hence, it is clear that the plan does indeed grant authority to the service representative to develop a database to use in determining what the usual and customary charges are for a particular service in a given region. It is also clear from the administrative record that VO and Regence Blue Shield decided to allow only the payment of a flat rate per admission but that they did not apprise the plaintiff or Innercept of this decision until October, 2007. (AR0691–AR074, AR0944). It is **not** clear after an exhaustive review of the administrative record, however, where that database is, how it was developed, how it resulted in the calculation of the figure of $13,753 as being the usual and customary charge for the zip code in question, or whether it was used to determine that this same figure should be used as the benefit maximum for A.H.'s Innercept admission in March, 2007. Plaintiff, on the other hand, produced and submitted to the defendants a report from the University of New Hampshire and the National Association of Therapeutic Schools and Programs (NATSAP) which evinced that the amounts charged per day by

providers like Innercept ranges nationally from a low of $125 to a high of $700, with an average of $318, which is about what Innercept charged for the care which A.H. received. (AR0632- AR0646). Thus we find that the decision limiting the expenses for the plaintiff's son's admission and stay at Innercept to the flat rate of $13,753 was unsupported by substantial evidence and without apparent reason. We consequently conclude that this decision constituted an abuse of discretion. See, Abnathya, 2 F.3d at 45; Orr, 2007 U.S. Dist. LEXIS at *31-*32. Further, inasmuch as there is nothing on this record to refute the reasonableness of this $318 per day rate, we find that for the period between March 7 and July 10, 2007, the plan should have paid the sum of $40,068 for A.H.'s stay at Innercept. Thus with respect to this decision, we shall grant Plaintiff's motion for summary judgment and direct that the plan reimburse him in the amount of $26,315.[12]

We next consider the reasonableness of Value Options' determination that A.H. no longer required the level of treatment which Innercept provided after July 10, 2007 and the Plan's refusal to pay for that care after that date.

---

[12] Because it appears that Mr. Hirsh has already paid Innercept's bill in full, we direct that the plan reimburse him for the difference between the $40,068 charged for the services provided to A.H. between March 7 and July 10, 2007 and the $13,753 previously paid.

The Innercept records are somewhat scant for this period of time; however, it appears that by June 30, 2007, A.H. had begun to make some positive changes in his life and had begun to gain better control of his behavior, at least within the confines of the Innercept environment. (AR0016-AR0023). He was on a home visit from July 6 through July 10, 2007 which reportedly went well, although A.H. apparently was irritable and contentious with Innercept staff and had some issues with inappropriate boundaries with a female peer upon his return. (AR085-AR086). The plaintiff and his family were concerned that A.H. would not accept boundaries should he be returned home permanently and his doctors were concerned that he would resume his drug use. (AR0087). Despite these concerns, VO found that A.H. did not meet its criteria (3.30, et. seq.) for continuing care in a residential treatment center. Specifically, VO determined and Regence Blue Shield agreed, that A.H. satisfied Exclusion Criteria 3[13] and did not meet

---

[13] Under the Exclusion Criteria for Residential Treatment Center Services (RTS)(Child/Adolescent) 3.301,

> *Any of the following criteria is sufficient for exclusion from this level of care:*

> ....

> 3.   The child/adolescent can be safely maintained and effectively treated at a less intensive level of care.

Continued Stay Criteria 4[14] because "[h]e is able to safely be treated in a community setting while living with his family. He is nearly at grade level and has fallen behind since in attendance at the RTC level of care. His return home can include the start of summer school, family therapy, individual therapy and voluntary guidance from the Department of Probation if necessary." (AR0087). The Administrative Record suggests that there was some type of peer to peer review of A.H.'s records by a Dr. Rao, who presumably reviewed his medical records and spoke with his attending physician, Dr. Ullrich. Nevertheless, it is unclear what information Dr. Rao and/or Value Options relied upon in concluding that A.H. could be treated in a "community setting" with "family therapy, individual therapy and voluntary guidance from the Department of Probation if necessary,[15]" or that summer school was even

---

(AR0333-AR0334).

[14] Under the Continued Stay Criteria for Residential Treatment Center Services (RTS)(Child/Adolescent) 3.301,

> All of the following criteria are necessary for continuing treatment at this level of care:

> ....

> 4.  All services and treatment are carefully structured to achieve optimum results in the most time efficient manner possible consistent with sound clinical practice.

[15] The remark concerning the Department of Probation is particularly puzzling given that there is no evidence that A.H.

available to A.H.. Rather, the notes repeatedly reference

A.H.'s moods as being "labile," "easily frustrated," that

he was "intimidating both with staff and peers," and

reflect the concern of Dr. Ullrich that A.H. would resume

his illegal drug use and otherwise relapse if he were

discharged too soon. (AR0001-AR0029, AR0087-AR0089). Again,

under the arbitrary and capricious standard of review, a

reviewing court may overturn an administrator's decision to

deny benefits if it is without reason or unsupported by

substantial evidence. See, Estate of Schwing, 562 F.3d at

526, n.2. We find this to be the case as to the decision to

deny coverage for A.H.'s Innercept care after July 10,

2007. Given that we cannot discern from the record before

us how long after July 10, 2007[16] A.H. may have continued to

_____

was ever the subject of a juvenile court or other court
proceeding or convicted of any crime.

[16] Indeed, it appears that on or about December 4, 2007, A.H. was
admitted for inpatient care at a psychiatric hospital due to his
reports of hearing voices, suicidal ideation, obsessive,
threatening and aggressive behaviors regarding a female peer. He
remained there until December 15, 2007 when he was discharged
back to Innercept. (AR0092-AR0095). In addition, in late
November, 2007, A.H. was evaluated by Doris Lebischak, M.D., a
psychiatrist in Wayne, Pennsylvania, who diagnosed him as then
suffering from, inter alia, "Major Depressive Disorder with
psychotic features vs. Schizoaffective Disorder #295.70,
depressive type vs. Schizophreniform disorder 295.40, Anxiety
Disorder with obsessive thoughts and Polysubstance dependence
#304.8." Dr. Lebischak further opined that:

> "A.H.'s present level of care is inpatient mental health
> and acute residential treatment facility. A.H. needs a
> specialized program to meet his unique educational and

require the level of care provided by Innercept, we shall remand this matter to the administrator for re-evaluation of this issue.

Finally, we consider whether the refusal to cover A.H.'s treatment at the King George School ("KGS")in Vermont constituted an abuse of discretion and/or was arbitrary and capricious. In this regard, there is virtually no evidence whatsoever as to what type of treatment and care was available and/or provided to A.H., what his condition was upon admission to or during his stay at the facility or how or if he may have benefitted from the treatment received. It further does not appear from the plan documents that therapeutic boarding schools are recognized as "providers" within the meaning of the plan. Insofar as it is incumbent upon a plaintiff seeking to recover under Section 502(a)(1)(B)to demonstrate that the benefits are "actually due," (See, e.g., Hooven, supra.) we find that as to KGS, Mr. Hirsh has failed to satisfy this obligation. Accordingly, we find no abuse of discretion on

---

mental health needs. There needs to be control of expressed emotion in the setting with small group instruction, intensive therapeutic supports and AA/NA component with weekly psychiatric intervention and a program that is able to maintain and monitor hygiene and prompt as needed. A closed unit or highly secure unit for safety concerns of suicide, self-injury and assault risks as well as elopement risk continues to be medically necessary."

(AR0060-AR0063).

the part of the plan administrator(s) in denying payment
and/or reimbursement for A.H.'s admission and stay at the
King George School.

For all of the foregoing reasons, we shall grant in
part and deny in part the parties' cross-motions for
summary judgment. An appropriate order follows.

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| JOEL E. HIRSH | : CIVIL ACTION |
| | : |
| vs. | : |
| | : NO. 09-CV-3120 |
| BOEING HEALTH AND WELFARE | : |
| BENEFIT PLAN, a/k/a THE | : |
| BOEING TRADITIONAL MEDICAL | : |
| PLAN, and BOEING EMPLOYEE | : |
| BENEFITS PLAN COMMITTEE | : |

## ORDER

AND NOW, this 14th day of June, 2010, upon consideration of the Motion for Summary Judgment of Defendants Boeing Health and Welfare Plan and Boeing Employee Benefits Plan Committee (Doc. No. 11) and Plaintiff's Motion for Summary Judgment (Doc. No. 12), it is hereby ORDERED as follows:

1. Plaintiff's Motion is GRANTED IN PART, Judgment is entered in favor of Plaintiff in the amount of $26,315 and this matter is REMANDED to the Plan Administrator(s) for reconsideration of A.H.'s entitlement to benefits for the care and treatment which he received at Innercept after July 10, 2007. In all other respects, the Plaintiff's Motion for Summary Judgment is DENIED.

2. Defendants' Motion is GRANTED IN PART and Judgment is entered in favor of the Defendants as a matter of law as to Plaintiff's claim for benefits for the treatment and

care rendered to his son, A.H. at the King George School in Sutton, VT. In all other respects, the Defendants' Motion for Summary Judgment is DENIED.

BY THE COURT:


s/J. Curtis Joyner
J. CURTIS JOYNER, J.